## Commonwealth v. Kaufman

*Albert S. Oliensis*, Assistant District Attorney, for Commonwealth.

*Lemuel B. Schofield* and *W. Bradley Ward*, for defendant.

OLIVER, P. J., September 6, 1955.—On August 23, 1952, at about 12 o'clock (D. S. T.) a fire occurred in a warehouse located at 5407-09 Wyalusing Avenue, Philadelphia. The warehouse contained furniture belonging to Furniture Fair, a corporation engaged in the retail sale of furniture at 5839 Market Street in

that city. Following an investigation by the office of the fire marshal, a warrant was issued on March 11, 1953, for the arrest of Louis Kaufman, defendant, owner of one third of the capital stock of Furniture Fair, upon a charge of arson in connection with the fire. He was subsequently indicted for that crime.

Defendant was tried before a jury, which rendered a verdict of guilty.

Defendant thereafter moved for a new trial and in arrest of judgment. These motions are now before the court.

The warehouse in question, and the furniture therein, had become infested with cockroaches about a month before the fire occurred. The owners of Furniture Fair first attempted to get rid of the roaches by using a few D. D. T. bombs, but this method was unsuccessful. At 10:30 (D. S. T.) on the morning of the fire, defendant and two employes of Furniture Fair went to the warehouse and there one of the employes, under the supervision of defendant, placed and lighted eleven sulphur candles in the expectation that the fumes would exterminate the roaches.

The placing of these candles took approximately 10 minutes. After placing them, the three men walked down the driveway, which runs along the front of the warehouse, out to the street. Defendant testified that, as he left the warehouse, he leaned over to tie his shoe, and as he did so, several articles fell out of his shirt pocket. He picked them up and continued walking to the street. There the two employes got into a company truck and drove back to the store, which by automobile was only five minutes distant from the warehouse. According to defendant's testimony, he got into his own automobile and started back to the store alone, but, about halfway there, he noticed that his green pencil was missing, so he returned to the warehouse. He testified that he found his pencil about three fourths

of the way up the driveway at the place where he had leaned over to tie his shoe, which is where he had picked up his other belongings, and that he then returned to the store. Defendant maintained that he did not at this time enter the warehouse.

However, the Commonwealth produced an unusually credible witness, William Sullender, who leases a place of business adjoining the warehouse in question. Sullender testified that, on the morning of the fire, he noticed someone going up the driveway. A desire to protect the property from unlawful intrusion led him to go to a back door of his place of business, which opens onto the driveway, to see who it was. As he opened the door, he saw defendant opening the front door of the warehouse. Sullender said to him, "Oh, it's you," and defendant turned to look directly at Sullender and then entered the warehouse, where he stayed approximately 10 minutes.

In a statement given to the fire marshal's office, and also under cross-examination, defendant admitted that he returned to the warehouse to look for his pencil, that at that time he saw Sullender and that Sullender said to him, as Sullender testified, "Oh, it's you".

About ten minutes after defendant returned alone to the store, at 11 a.m. (D. S. T.), defendant's partner,[*] Cohen, asked defendant and his brother to take a chair to the warehouse, match it with another chair, and bring both back to the store. They claimed, however, that at that time the sulphur fumes were so acrid they could not enter, so they locked the door and returned to the store with the chair they had been carrying. This testimony was not contradicted by the Commonwealth, except that the firemen who extinguished the fire testified they found no odor of sulphur-candle fumes when they entered the building.

---

[*] Although Furniture Fair was a corporation, the stockholders referred to each other as partners throughout the trial.

Captain Di Romaldo was the first officer of the fire department to arrive at the warehouse after the outbreak of the fire. He testified that he entered the warehouse with his men and fought "four or five unconnected fires", which were "coming from the floor up". He could not see all the separate fires at one time because of the dense smoke, but came upon each fire as he and his men advanced further into the warehouse. Under cross-examination, although he admitted that he could not see well inside the warehouse, he reiterated that he and his men had to fight four or five "individual fires". He was asked if these "individual fires" could have been caused by sparks leaping from one place to another. He replied that they could not have been so caused because the fires were coming up from the floor. The base of all these fires was at the floor whereas, if the fires had been caused by leaping sparks, they would have been burning from the top and not from the bottom.

The next witness, Captain Putz, testified that he came in with a ladder company and went at first up to the roof but that, when he came down into the building, he saw there was a partition which separated portions of the ground floor, and he saw there had been fire in both of these areas, that is, on both sides of the partition.

Then Captain Hassett, the assistant fire marshal, whose duty it was to investigate fires and their causes for the fire department, testified that, upon making his own investigation, he found sulphur candles dangerously close to inflammable materials of the type which would both carry and accelerate a fire if they were lighted.

It was then developed that Captain Hassett had been with the Philadelphia Fire Department for over 14 years and had also been in charge of the Marine Corps Fire Department at Camp Lejuene, N. C., for three

years. In addition, he had attended three arson seminars at Purdue University and one seminar at New York University. For a period of years it had been his duty to investigate fires for the Philadelphia Fire Department and to determine, if possible, their nature and origin.

Captain Hassett was then asked whether, on the basis of the testimony given by Captain Di Romaldo and Captain Putz, which he had heard in open court, and his own examination of the premises, he had formed an opinion as an expert as to the cause of the fire. He replied that he very definitely had. Further questions brought forth his answer that the fire, in his opinion, was of incendiary origin.

The position of the sulphur candles, as seen from photographs taken by the fire department after the fire, indicated that the candles had deliberately been placed near combustible material in such position that a fire was inevitable. The candles had originally been placed in a warehouse by defendant and two employes. These three, after looking at the fire department photographs, expressed the opinion that the candles shown were not in the position in which they had originally been placed. A strong inference arose that someone had gone back to the warehouse before the fire and had changed the position of the candles. As above stated, after the three men placed the candles defendant had returned to the warehouse alone and had entered it and the fire broke out a short time thereafter. It is significant that defendant, in his interrogation by the investigators of the fire department, never admitted returning to the warehouse by himself until after Captain Hassett had been informed by Sullender that defendant had entered the warehouse alone, shortly before the fire broke out.

There are many other facts which support the jury's verdict.

Chick Nagel, one of the two men who were with defendant when the candles were placed, told Captain Hassett that, as he was on his way to be interviewed by the captain, defendant said to him, in effect, "Remember, we all came back to the store together". Chick also said to Captain Hassett, in response to a question, that he was not sure he would tell, even if he knew, that someone connected with the store had started the fire, because he had a job to protect, and he had a wife and a child to look after.

Defendant acted most strangely after the fire. He had been seen by Sullender to return to the building shortly after he and Chick and Carl had set the candles and had departed. But, when news of the fire was received at the store, everyone there except defendant left the store and went to the scene of the fire. Defendant alone remained at the store. Furthermore, defendant did not even go to the warehouse later that day or that week. He let a month go by before he went to the warehouse. And he did not tell Captain Hassett, in the first instance, that he had gone back to the warehouse alone after he and Chick and Carl had placed the candles. It was only after Sullender reported he had seen defendant come back, and go into the warehouse alone, that defendant said, yes, he had gone back but only to pick up his pencil.

Also, if defendant had dropped a bright green pencil from his pocket when he came out of the warehouse with Chick and Carl, at the time he says he dropped several articles, he would have seen it when he stooped to pick them up, and he would have missed it from his pocket. He would not have had to return to the warehouse for it. It was a bright, clear day, and defendant admits he found the pencil on his return to the warehouse at the spot where he picked up his other belongings.

The evidence further shows that, in addition to opportunity, defendant had a strong motive for setting fire to the warehouse. The business of Furniture Fair was not in a flourishing condition, notwithstanding the testimony of its accountant. After payment of the $6,000 per year salaries drawn by defendant and two other officers of the corporation, Furniture Fair had earned a profit of only $240 during the first seven months of 1952. The business was indebted on a secured note in the amount of $56,000 and was obligated to pay $1,000 on this note every two months. It therefore had bimonthly an average net profit of only $68.50 as compared with a fixed liability of $1,000 on the note. Defendant was personally liable on this note and had pledged his assets as security for its payment in due course. The business was in such poor financial condition that one of the three owners, in order to withdraw, suffered the loss of his investment and in addition paid Cohen a bonus of $5,000 to take over his interest and his liability on the note. Moreover, the business had $25,000 worth of furniture in its warehouse which, defendant himself admitted, was unsalable because it was infested with roaches. Sixty thousand dollars of insurance was carried on the furniture in the warehouse, payable either to Furniture Fair or to the holder of the secured note, as their interest should appear. There was thus a clear motive for the arson.

One reason advanced by defendant for a new trial is based on new evidence, allegedly discovered after conviction. This new evidence consists merely of proposed testimony by one Robert Bass to the following effect: That at approximately 10:30 (D. S. T.) on the morning of the fire Bass saw three men enter the warehouse in question, stay a few minutes and leave. For the next 30 or 40 minutes he was occupied with his work. (It was during this interval that defendant returned and entered the building alone.) At approxi-

mately 11:10 (D. S. T.) he noticed two men, one carrying a chair, go up the driveway leading to the warehouse, open the door and then close the door and leave without entering the warehouse. Shortly thereafter he saw Sullender and another man go up to the warehouse door and open it. He does not recall whether Sulllender entered the warehouse or not.

This proposed testimony would add nothing of substance to the facts already in the record. The crucial fact is that, *between defendant's two visits to the warehouse* which were seen by Robert Bass and are not disputed by the Commonwealth, *defendant returned to the warehouse alone.* Defendant himself admitted this and also admitted it was on that occasion he and Sullender saw each other and Sullender spoke to him. Sullender testified he saw defendant at that time enter the warehouse alone. The proposed after-discovered evidence does not touch upon that vital point at all, because Bass acknowledges that, while this happened, he was occupied with his own work.

There is, likewise, no merit in defendant's contention that it was error to permit an expert witness to express his opinion that the fire was of incendiary origin. It is true there are some cases in this country which hold that an expert may not give his opinion as to the nature of the origin of a fire. There are also cases which hold that one, properly qualified as an expert, may give such an opinion. Therefore, it serves no useful purpose to cite cases simply to support the negative or affirmative of the question. It is more important to consider the reasons advanced for the refusal to allow such expert opinion.

There are two arguments advanced as to why an expert should not be permitted to express an opinion as to the nature of the origin of a fire. The first is that, in such a situation, to allow an expert witness to express his opinion would be to allow that witness to

"usurp the function of the jury". This phrase is made to imply a moral impropriety or a tactical unfairness in the witness' expression of opinion. The argument thus advanced is answered best by Professor Wigmore in his treatise on evidence. He states:

". . . the phrase is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric. There is no such reason for the rule, because the witness, in expressing his opinion, is not attempting to 'usurp' the jury's function; nor could he if he desired. . . . He could not usurp it if he would, because the jury may still reject his opinion and accept some other view, and no legal power, . . . can compel them to accept the witness' opinion against their own": Wigmore, on Evidence, 3rd ed., vol. VII, §1920.

The trial judge made substantially the same observation during the course of this trial. He pointed out that, even though an expert witness express an opinion, the credibility and weight to be given to such an opinion is still a question solely for the jury. The jury is always free to disregard an expert's opinion and substitute its own. Therefore, to hold that to permit an expert to express an opinion on the nature of the fire's origin is to permit an expert to usurp the jury's function appears to be both senseless and erroneous.

Our Pennsylvania Supreme Court has come to the same conclusion. In Cooper v. Metropolitan Life Insurance Co., 323 Pa. 295, 302 (1936), the court said:

"The other objection . . . is now made the basis for contending that the examination permitted the doctors to substitute their opinion for the conclusions of the jury, based upon all the testimony and the charge of the court. Appellant's theory also is that these are subjects which do not require expert testimony but are matters upon which the jury are as well informed as the witnesses. Both contentions must be rejected. The

court and the jury remained free to deal with this evidence like any other. They were not bound by the opinions of the witnesses. . . . Their testimony, if believed, merely proved another fact—that in the light of their general experience and of their observation of plaintiff, they had reached the conclusions announced. Those were facts to be considered with the other evidence; they might be rejected in whole or in part; the weight to be given them was for the jury."

The second reason advanced against the admissibility of an expert's opinion as to the nature of a fire's origin is that such an opinion is on the ultimate fact in issue, which is for the jury to determine. Professor Wigmore has this to say about that contention:

"Another erroneous test . . . is that an opinion can never be received when it touches 'the very issue before the jury.' The fallacy of this doctrine is, of course, that it is both too narrow and too broad, measured by the principle. It is too broad, because, even when the very point in issue is to be spoken to, the jury should have help if it is needed. It is too narrow, because opinion may be inadmissible even when it deals with something other than the point in issue. Furthermore, the rule if carried out strictly and invariably would exclude the most necessary testimony. *When all is said, it remains simply one of those impracticable and misconceived utterances which lack any justification in principle*": Wigmore, on Evidence, 3rd ed., vol. VII, §1921. (Italics supplied.)

Our Supreme Court is also in accord with the above. It has said:

"The other objection . . . is now made the basis for contending that the examination permitted the doctors to pass upon the ultimate question before the jury. . . . Certain federal cases . . . are said to support the proposition that expert witnesses may not give opinions on the ultimate issue to be decided by the jury. If we

understand appellant, it must be said that such opinions are received constantly in this Commonwealth. For example, in many eminent domain cases, the only question is the amount of compensation payable for land taken and almost always the proof is by opinion evidence; where the ultimate issue is sanity or insanity, opinion evidence is frequently all there is; other examples are common": Cooper v. Met. Life Insurance Co., supra, at page 302. It is therefore clear that the reasons urged against allowing an expert to express an opinion as to the cause of the origin of a fire are groundless.

At trial, the Commonwealth's theory was that defendant entered the warehouse alone and deliberately placed the sulphur candles in such position that a fire was inevitable. Counsel for defendant tried to develop the theory that the fire was not of an incendiary origin, but might have started in other ways. The defense called attention to the fact that a 300-watt light bulb was used in the warehouse and might not have been turned off prior to the fire. From this it was urged that the hot bulb might have come in contact with some inflammable substance, thus causing the fire. The defense also contended that this bulb could be moved about by means of a long extension cord used in conjunction with it. From this the jury was also urged to deduce that the fire may have been caused by a "short" in the extension cord. However, the firemen testified this bulb and the extension cord were found intact after the fire had been extinguished.

At least three theories were advanced as to the possible cause of the fire. We therefore believe it was proper and helpful to permit the assistant fire marshal, who was eminently qualified by long training and experience to determine the cause and origin of the fire, to state his opinion for the benefit of the jury.

It is true that in one case our Pennsylvania Superior

Court has indicated that an expert may not give his opinion as to the nature of the origin of a fire: Commonwealth v. Greenberg, 143 Pa. Superior Ct. 203 (1940). However, that case does not control the issue before this court. In it the Superior Court merely sustained the ruling of the trial judge who, in the exercise of his discretion, refused to allow an expert, called as a witness by defendant, to testify as to whether, in his opinion, the fire was accidental or incendiary. The Superior Court said merely: "We are not convinced that any error was committed in this ruling." The court did not make a flat holding that, in all such cases, an expert may not properly render an opinion as to the origin of the fire. The court simply held that, in that particular case, the trial judge had committed no error in refusing to allow the testimony. This is in line with the law in Pennsylvania. In the leading case of Cooper v. Met. Life Insurance Co., supra, at page 301, our Supreme Court, speaking on the question of admissibility of expert testimony: said:

"Necessity is the ground of admissibility of such evidence. Whether a necessity exists, and whether a witness is qualified, are in the first instance to be determined by the trial judge. If he decides that it is necessary and that the witness is qualified, the questions on review are whether he has abused his power in so deciding (citations omitted) and whether the opinion . . . was admissible."

We believe there was no reason, in law or fact, for the trial judge in the present case to refuse to allow expert testimony from an eminently qualified witness.

In his charge to the jury, the trial judge stated that a witness had testified that the furniture in the warehouse was unsalable because infested with cockroaches. Defense counsel strenuously objected, maintaining there was no such testimony. The court replied:

"There was a definite statement to that effect. I

would have to go through my notes. I will simply say to the jury, 'If you do not recall that a witness said it, then disregard my statement'."

The fact is, however, that defendant himself testified that furniture infested with cockroaches is unsalable and that the roaches must be exterminated first before such furniture can be sold. In reply to the question, "You can't sell furniture with cockroaches in it?" defendant answered: "No, sir, they have to be cleaned out".

At oral argument, counsel for defendant complained that the trial judge, in his charge to the jury, used the word "discrepancy" in describing the difference in the value of the furniture damaged or destroyed by the fire as stated by Furniture Fair on the one hand and by the insurance company on the other. Defense counsel contended that the word "discrepancy" carries a sinister or evil connotation and, therefore, its use was prejudicial. Nowhere in his charge to the jury did the trial judge use the word "discrepancy" and, even if he had, there would have been nothing prejudicial in it, for the word is defined merely as "a difference or inconsistency": Webster's New World Dictionary, college ed., 1954.

We believe there is a lack of substance in the arguments advanced by defendant in his effort to overturn the verdict of the jury which was fully and fairly warranted by the evidence.

Judge Davis and Judge Hagan, who also heard defendant's argument in support of his motions, join in this opinion and in the order herein entered.

And now, September 6, 1955, defendant's motions in arrest of judgment and for new trial are dismissed.